UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| KATHLEEN MORIARTY, | CASE NO. 2:23-cv-01209-TL |
| Plaintiff, | |
| v. | ORDER ON MOTION FOR SUMMARY JUDGMENT |
| PORT OF SEATTLE, | |
| Defendant. | |

This matter is before the Court on Defendant's Motion for Summary Judgment. Dkt. No. 44. Having considered Plaintiff's response (Dkt. No. 55), Defendant's reply (Dkt. No. 67), the exhibits submitted in support, and the relevant record,[1] the Court GRANTS Defendant's motion.

## I.    BACKGROUND

The following facts either are not genuinely disputed or are taken in the light most favorable to Plaintiff, the non-moving party.

---

[1] The parties did not request oral argument.

## A.    Port of Seattle and Plaintiff's Job

From June 2003 to November 2021, Plaintiff Kathleen Moriarty was an employee of Defendant, the Port of Seattle ("the Port"). Dkt. No. 57 (Moriarty Decl. and Exhibits) ¶ 2; Dkt. No. 48 (Gerard Decl. and Exhibits) ¶ 22. The Port is a county-wide special purpose government responsible for providing trade, travel, and logistics services. Dkt. No. 52 (Metruck Decl.) ¶ 2. "The Port owns and operates Seattle-Tacoma International Airport . . . , the West Coast's largest cruise operation, four marinas, and—in partnership with the Port of Tacoma—the Northwest Seaport Alliance . . . ." *Id.* The Port has approximately 2,200 employees and its work is supported by approximately 20,000 total workers employed by the Port, airlines, contractors, Transportation Security Administration, and others. *Id.* ¶¶ 2–3.

Plaintiff was first hired by Defendant as an apprentice carpenter. Dkt. No. 57 ¶ 2. Plaintiff rose in leadership at the Port and, in 2012, became the Carpenter and Pile Buck General Crew Chief in the Marine Maintenance Division ("MMD"). *Id.* Among Port staff, this is often referred to as a "general foreman" position. *Id.* Plaintiff remained in this position until November 2021, when she was terminated for failure to comply with a COVID-19 vaccination requirement instituted by Defendant for its employees during the COVID-19 pandemic.[2] Dkt. No. 48 ¶ 22. This action arises out of that termination.

The record paints Plaintiff as an exemplary employee during her nearly two decades of service to the Port. Plaintiff's direct supervisor, Dan Fitzgerald, testifies that Plaintiff was "a capable and respected leader," whose "office served as a hub for not only her own team but also for many managers and crew members throughout the department." Dkt. No. 59 (Fitzgerald Decl.) ¶ 7. In addition to being the first woman general foreman in the Marine Maintenance

---

[2] For simplicity, the Court refers in this Order to both the novel coronavirus SARS-CoV-2 and the disease it causes as "COVID-19."

Division, Plaintiff was honored with several awards, recognized as the 2011 Charles Blood Champion of Diversity, and the 2012 Blacks in Government Leader of the Year. Dkt. No. 57 ¶ 2.

Even before she was promoted to Carpenter and Pile Buck General Crew Chief, Plaintiff had begun to learn the role when she was trained as a back-up to her predecessor. Dkt. No. 57 ¶ 4. During her seven years as Carpenter and Pile Buck General Crew Chief, Plaintiff's duties evolved with time, and she "made the job [her] own" under the supervision of her manager or director. *Id.* Specifically, Plaintiff's administrative responsibilities increased, reducing her available time to oversee work performed by crews in the field. *Id.* ¶ 8. When Plaintiff first became Carpenter and Pile Buck General Crew Chief in 2011, she was assisted by two "crew chiefs," one who was responsible for the work of the Lock and Security Shop ("lock shop"), and another who directly supervised on-site work. *Id.* Plaintiff herself was responsible for supervision of "fieldwork" performed by crews off site. *Id.* In 2016, as Plaintiff's administrative responsibilities grew, an additional crew chief position was added to cover the supervision of fieldwork. *Id.* Two years later, the lead pile buck in MMD was given the title of crew chief and assigned to supervise a new full-time carpenter position. *Id.* ¶ 9. This left Plaintiff with only her four crew chiefs as direct reports. *Id.* Plaintiffs met daily with each of the crew chiefs, usually over the phone, and the crew chiefs were responsible for the day-to-day supervision of the crews performing MMD's maintenance work and other projects. *Id.*

There were at least two periods of Plaintiff's employment with Defendant during which she worked remotely or on a modified schedule. In 2015, she was allowed to work from home for eight weeks while she recovered from foot surgery. *Id.* ¶ 13. To Plaintiff's knowledge, no one was required to cover her responsibilities during that time, and everything ran smoothly. *Id.* Plaintiff also testifies that she "frequently worked a hybrid schedule during the years of 2014–2020" in order to care for her ailing father or assist with her niece and nephew's remote

learning. *Id.* ¶ 14. Sometimes, this hybrid schedule entailed Plaintiff's going into the office from 2 or 3 a.m. until 7 a.m. "to get everything lined up for the day," then finishing her workday remotely. *Id.* Most of these days, Plaintiff did not physically interact with any of her coworkers at the Port. *Id.* It is not clear from the record how often during the 2014–20 time period Plaintiff worked in this "hybrid" mode, or whether these days were dispersed or clustered into stretches of consecutive hybrid workdays.

**B.    The COVID-19 Pandemic in Washington**

On January 20, 2020, Western Washington took center stage in an evolving national and international crisis as the site of North America's first known case of COVID-19, the disease caused by the novel coronavirus SARS-CoV-2. Dkt. No. 51 (Lynch Decl.) ¶¶ 14, 16. By the end of the month, both the World Health Organization and then-U.S. Health and Human Services Secretary Alex M. Azar II had officially declared the COVID-19 pandemic a public health emergency. *Id.* ¶ 17. In Washington and around the world, daily life quickly turned upside down. By March 2020, the virus's "rampant spread" had compelled federal, state, and local governments to take such "drastic actions" as "institut[ing] 'stay home' orders" and "implement[ing] widespread 'social distancing measures.'" *Pimentel-Estrada v. Barr*, 458 F. Supp. 3d 1226, 1233 (W.D. Wash. 2020).

COVID-19 is an infectious disease that spreads easily from person to person through tiny droplets called *aerosols*, which are produced when a person exhales, coughs, sneezes, or talks, and which can linger in indoor spaces like cigarette smoke. Dkt. No. 51 ¶¶ 15, 76. People who contract COVID-19 can spread the virus before they have symptoms. *Id.* ¶ 15. Some people become infected without developing any symptoms (i.e., asymptomatic infection) but can still spread the virus, potentially without knowing that they were ever infected. *Id.* Individuals who do develop symptoms may experience a range of physical impacts, from mild or moderate

symptoms, to severe symptoms requiring hospitalization, to death. *Id.* Some patients who do recover from acute COVID-19 infection are left disabled by chronic illness colloquially referred to as "long Covid." *Id.* ¶ 15.

Scientists began working to develop vaccines against COVID-19 in January 2020. *Id.* ¶ 21. There was a broad consensus in the public health community that an effective vaccination would be the key to emerging from the deep disruption caused by pre-vaccine mitigation measures such as lockdown orders. *Id.* ¶¶ 18, 20. The first vaccines were granted emergency-use authorization by the Food and Drug Administration ("FDA") in December 2020. *Id.* ¶¶ 22–23. After promising results, the first of these was approved by the FDA for adult use in August 2021. *Id.* ¶¶ 29, 32, 34. This was the Pfizer vaccine, which had been shown in lab trials to prevent 95% of confirmed COVID-19 cases. *Id.* ¶¶ 29, 34.

Although a vaccinated individual may still contract COVID-19 (experiencing what is known as a "breakthrough infection"), vaccines are associated with a greatly reduced risk of severe illness or death. *Id*. ¶ 83. A May 2021 study of healthcare workers in Israel showed not only that the infection rate was much lower among those who were vaccinated, but also that most vaccinated people who became infected were asymptomatic, while most unvaccinated people who became infected developed symptoms. *Id.* ¶ 84. Breakthrough infections in vaccinated people are also less likely to be passed along to others than infections in unvaccinated people. *Id.* Vaccination was able not only to save lives, but to slow the spread of infection, protect vulnerable populations disproportionately impacted by COVID-19, and reduce strain on healthcare systems overtaxed by COVID-19 hospitalizations. *Id.* ¶ 40; *see id.* ¶ 19.

After the COVID-19 virus was first discovered in December 2019, it continued to evolve into new and more contagious variants. *Id.* ¶ 15. In August and September of 2021, the so-called Delta variant of COVID-19 ("Delta") was surging in Washington and elsewhere in the United

States. *Id.* ¶¶ 68–69. Delta was more than twice as contagious as earlier variants. *Id.* ¶ 69. Data at the time also showed that Delta caused longer infections and more serious illness than previous variants. *Id.* ¶ 70. As of July 30, 2021, the Washington Department of Health estimated that 1 in 172 Washingtonians had an active COVID-19 infection. *Id.* ¶ 69. One week later, that proportion had increased to 1 in 156. *Id.* COVID-19 hospitalizations in the state were at an all-time high that summer and fall, and 95% of hospitalized patients were unvaccinated. *Id.* At the time, unvaccinated individuals between the ages of 16 and 64 were 10 times more likely to be hospitalized. *Id.*

In the late summer and early fall of 2021, Washington Governor Jay Inslee issued several versions of a proclamation that would prohibit most state employees and Washington healthcare workers from working after October 18, 2021, without being fully vaccinated against COVID-19. *Id.* ¶ 65. King County also established vaccination requirements for its employees. *Id.* ¶ 66. By that time, vaccines had been shown to be safe and highly effective at preventing severe illness caused by COVID-19, and the current data also showed that immunity from vaccination was more protective than immunity derived from previous COVID-19 infection. *Id.* ¶ 71. While masking, testing, and social distancing could be used in combination with vaccination, it was not known in late 2021 how effective any of these other mitigation measures were. ¶¶ 75, 102.

**C.    Defendant's COVID-19 Response and the Workplace Disruption**

On March 16, 2020, the Port's Executive Director, Stephen Metruck, declared an emergency/workplace disruption at the Port in response to the COVID-19 pandemic. [3] Dkt.

---

[3] A "workplace disruption" is term used by the Port to designate a "condition adversely affecting Port employees, facilities or operations," such as extreme weather, natural disasters, epidemics, or civil disturbances. Dkt. No. 56 (Earl Decl. and Exhibits) at 26 (EX-9 as of March 9, 2020). During a workplace disruption, Port leadership may implement variations from normal operations, including Port closures and remote work for employees who typically

1  No. 52 ¶ 4. Metruck suspended all nonessential travel, instituted a hiring freeze, and

2  implemented a telework policy for employees who could perform work from home. *Id.* The

3  "COVID-19 Workplace Disruption" classified workers into essential and nonessential categories.

4  Dkt. No. 57 ¶ 16. To protect frontline employees whose jobs were essential and could not be

5  performed remotely, including police officers, firefighters, security personnel, airport bus

6  drivers, and others, Defendant adopted comprehensive health and safety protocols consistent

7  with federal, state, and county public health guidance and data. *Id.* ¶ 5. In May 2020, following

8  King County's adoption of a public health directive requiring face coverings in public,

9  Defendant adopted Human Resources policy HR-32, requiring all Port employees to wear face

10  coverings. *Id.*; Dkt. No. 48 ¶ 7.

11      During the COVID-19 workplace disruption, Plaintiff recalls that "non-essential"

12  workers were not allowed to report to work in person. Dkt. No. 57 ¶ 16. Plaintiff, like other

13  "general foremen" and some crew chiefs, was allowed to work remotely even though she was

14  classified as "essential." *Id.* She worked remotely for the first two weeks of the workplace

15  disruption, then chose to return to in-person management at the MMD office for the remainder of

16  the workplace disruption. *Id.* Plaintiff testifies that she chose to work in person to help the

17  morale of her crews, who felt "abandoned" as essential workers required to work on site. *Id.*

18  **D.    Defendant's Vaccination Policy and Exemption and Accommodation Process**

19      In August and September 2021, after the first COVID-19 vaccine had been approved by

20  the FDA, Metruck sent three emails encouraging employees to become vaccinated and to

21  voluntarily inform the Port when they had done so. Dkt. No. 52 ¶¶ 7–9; *see id.* at 6–19

22  (Metruck–Portwide emails). On September 14, 2021, Metruck announced that, in order "to

23

24  _____

work in person. *Id.* at 26–29. "Employees with a critical emergency response or business continuity role" are
identified as "Essential Personnel" during a workplace disruption. *Id.* at 27.

protect employees, our community, and our customers," the Port would begin requiring

employees to "receive a COVID vaccine as a condition of employment at the Port, with limited

exemptions for religious or medical reasons." *Id.* at 26. In the email announcing this policy,

Metruck cited King County data that "not fully vaccinated people are 50 times more likely to be

hospitalized for COVID[,] 30 times more likely to die of a COVID related illness[, and] seven

times more likely to test positive for COVID." *Id.* The Port's official vaccination policy for

employees, known as HR-34, was issued the same day. *See* Dkt. No. 48 at 12–15 (HR-34 as of

September 14, 2021).

HR-34 required all Port employees to be fully vaccinated against COVID-19 by

November 15, 2021, unless exempt and accommodated. *Id.* at 12. The policy allowed for

exemptions and accommodations for employees with "(a) an underlying medical condition or

disability that contraindicates administration of the COVID-19 vaccine, or (b) an objection based

upon a sincerely held religious belief," so long as a "reasonable accommodation can be

provided" that "does not create an undue hardship for the Port" or "pose a direct threat to the

health or safety of others." *Id.* at 14. The exemption and accommodation process for religious

beliefs involved three steps. First, employees were provided with the Port's "COVID-19

Vaccination Religious Exemption/Accommodation Request Form," which explained the process

and included space for employees to substantiate their need for a vaccination exemption. *Id.*

(Gerard Decl.) at 6 ¶ 13; *see id.* at 25–29. Second, once a religious exemption was granted, the

Port sent the requesting employee's manager a form titled "COVID-19 Vaccine Exemption

Request Questionnaire," which was used to collect information on job duties and the work

environment in order to assess possible accommodation options. *Id.* at 6 ¶ 13; *see id.* at 31–33.

Information collected included whether the requesting employee had been able to telework,

essential job functions requiring an on-site presence, and whether the employee's job required

1    interaction with others. *Id.* at 31–33. Third, once the questionnaire was completed, the Port's HR

2    Department reviewed the information before making an ultimate decision as to whether it would

3    be possible to accommodate the employee without imposing an undue burden on the Port. *Id.* at

4    6 ¶ 13.

5        By November 5, 2021, the Port had received 114 religious exemption requests, all of

6    which were granted. *Id.* Ultimately, the only type of accommodation Defendant determined it

7    could grant to its employees was fully remote work. *See id.* ¶¶ 18–19. In reaching this decision,

8    the Port considered information including: (1) scientific data establishing that an unvaccinated

9    individual posed a greater risk of contracting COVID-19, transmitting it to others, and

10   experiencing serious illness; and (2) information from the Port's Director of Health and Safety

11   regarding the feasibility of safety measures such as testing, masking, and social distancing as an

12   alternative to vaccination. *Id.* at ¶ 14; Dkt. No. 46 (Cummins Decl.) ¶¶ 14, 23–25. In considering

13   whether an employee could be reasonably accommodated with fully remote work, the Port

14   considered the employee's specific job duties and work environment; the impact of

15   accommodating the employee on Port operations, impacts of accommodating the employee on

16   other employees (such as safety concerns and reassignment of work), and the employee's pattern

17   of in-person work during the pandemic-related workplace disruption. Dkt. No. 48 ¶ 13. Where

18   Defendant determined an employee's exemption could not be accommodated, the employee had

19   an opportunity to participate in a *Loudermill*[4] meeting to share any information they wished the

20   Port to consider before making a final decision regarding their employment status. *See id.* ¶ 20.

21   _____

22   [4] "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citation modified). "To meet this requirement, the state must provide pre-termination notice with an

23   explanation of its evidence, and an opportunity for the employee facing discharge to respond, either orally or in writing." *Caraway v. Town of Columbus*, 765 F. App'x 374 (9th Cir. 2019). Where a state or city employee is given

24   a chance to respond orally before a termination, this is referred to as a "*Loudermill*" hearing or meeting. *Marable v.*

1    **E.    Plaintiff's Request for Accommodation**

2        On November 1, 2021, Plaintiff filed a request notifying the Port of her religious

3    objection to the COVID-19 vaccine and requesting an exemption from the vaccine requirement

4    as well as an accommodation for that exemption. *Id.* ¶ 15; *see id.* at 34–42. Plaintiff's religious

5    exemption was granted, as were all religious exemptions for Port employees who requested

6    them. *Id.* ¶¶ 13, 17. In accordance with its process for evaluating all such requests, Defendant

7    asked Plaintiff's direct supervisor, Dan Fitzgerald, to complete a COVID-19 Vaccine Exemption

8    Request Questionnaire about Plaintiff's job duties and work requirements. *Id.* ¶ 16. Fitzgerald

9    marked that Plaintiff's position was "telework eligible," but also that she was required to interact

10    in person with other Port employees, interact in person with contractors or vendors, and "provide

11    on-site supervision to Port Personnel, contractors, or others who work on-site." *Id.* at 44–45.

12    Fitzgerald noted that Plaintiff's "position has traditionally been on-site," and that "[a]ny flexible

13    work schedule will need to be reviewed frequently to ensure the core responsibilities are

14    maintained. Current Maritime directives are for any Manager who supervises employees to be

15    onsite at minimum of 3 days per week." *Id.* at 45. However, Fitzgerald suggested that Plaintiff's

16    position "could possibly provide unique opportunities to provide remote oversight as the Crew

17    Chiefs (4) that this position supervises ha[ve] direct oversight of the day-to-day operations and

18    ha[ve] the responsibility of managing the on-site crews. This type of arrangement was not

19    established pre-workplace disruption." *Id.* When asked if MMD's business needs could support a

20    100% telework accommodation for Plaintiff's position, Fitzgerald responded, "While it may be

21    possible to work into such an accommodation for this position, the 100% telework

22    accommodation has not been approved or tested in the past. In regard to the General Foreman

23

24    _____

*Nitchman*, 511 F.3d 924, 927 (9th Cir. 2007). In the COVID-19 context, the Ninth Circuit and numerous district Courts have held that *Loudermill* hearings may not always be required. *See infra* Section III.B.2.

position, any flexible work schedule that could be accommodated would need to be reviewed frequently to ensure core competencies of the position is [*sic*] maintained." *Id.* at 46.

In addition to reviewing Fitzgerald's questionnaire, the Port's Human Resources Department considered a job analysis of Plaintiff's position, which Fitzgerald provided via link. *Id.* ¶ 16; *see id.* at 44; Dkt. No. 54 (Whittaker Decl. and Exhibits) at 14–23.[5] This job analysis was developed by a consulting firm in September 2017, and its final page indicates that it was "Reviewed By: Kathleen Moriarty and Dan Fitzgerald." Dkt. No. 54 at 23.[6] This job description indicated 60% administrative work (including meetings), 10–20% supervising and assisting in and around the shop, 15–25% supervising and assisting in the field, and 5% trade-specific work. With this information, the Human Resources department determined that Plaintiff's position, which she typically performed 100% in person, could not reasonably be performed fully remotely without removing essential in-person functions from her job and reassigning them to other employees, and that such an accommodation was not reasonable. Dkt. No. 48 ¶ 19. Having already considered and rejected the possibility of hybrid work as an accommodation on a staff-wide level, Defendant did not consider hybrid work as a possible accommodation for Plaintiff at this time. *Id.* ¶ 18.

On November 8, 2021, Defendant informed Plaintiff of its decision that it was unable to accommodate Plaintiff's request for religious exemption from HR-34. Dkt. No. 48 at 48–49 (November 8, 2021, letter). In considering Plaintiff's religious exemption request and the information provided by Fitzgerald, Defendant found that "granting [Plaintiff's] accommodation request would pose an undue hardship on the Port by negatively impacting workplace safety and

---

[5] While this job analysis gave Plaintiff's title as Carpenter and Pile Buck Crew Chief rather than Carpenter and Pile Buck *General* Crew Chief, there is not a genuine dispute that the analysis was for Plaintiff's position. *See infra* Section III.B.1.b.(1).

[6] In deposition, Plaintiff testified she did not recall reviewing the job analysis, but that she "probably did." Dkt. No. 68 (Phillips Reply Decl. and Exhibits) at 7 (Moriarty Dep.).

posing a threat to the health and safety of employees and their families, the community, visitors, and others who spend time in Port facilities." *Id.* at 48.

On November 15, 2021, Plaintiff received a notice, via text and email, that, because she had not provided proof of COVID-19 vaccination, Defendant would be placing her on paid administrative leave effective November 16, 2021, pending a decision on her proposed separation from employment. *Id.* at 51–52 (November 15, 2021, notice). The notice also informed Plaintiff that she could attend a *Loudermill* meeting "to provide any information [she wished] to be considered before a decision [was] made on this proposal to separate [her] from employment," to be conducted on November 16, 2021. *Id.* Plaintiff was also permitted to respond in writing. *Id.*

In preparation for her *Loudermill* meeting, Plaintiff sent to Fitzgerald and Greg Gauthier, the Port's Labor Relations manager, multiple emails with statements and attachments that Plaintiff wanted the Port to consider in relation to her accommodation request. Dkt. No. 47 (Gauthier Decl.) ¶ 9. Gauthier shared these materials with Port decisionmakers before a final decision was reached on Plaintiff's termination. *Id.*[7]

On November 16, 2021, Plaintiff's *Loudermill* meeting was held. In attendance were Plaintiff, Fitzgerald, Gauthier, and Plaintiff's union representative. *Id.* ¶ 8. In that meeting, Port representatives stated that they would not discuss accommodations with Plaintiff, but only intended to review Plaintiff's noncompliance with HR-34. Dkt. No. 57 ¶ 69. At the conclusion of the meeting, Port representatives informed Plaintiff that they would make a decision regarding Plaintiff's continued employment within the next few days. *Id.* ¶ 78. Plaintiff was terminated on November 17, 2021. *Id.* ¶ 79.

---

[7] Plaintiff repeatedly alleges that Defendant did not read or consider these emails. However, these assertions either lack evidentiary support (Dkt. No. 55 at 36) or cite to deposition excerpts that were not provided to the Court (*id.* at 16).

1    **F.    Procedural History**

2        On June 26, 2023, Plaintiff commenced this action in King County Superior Court. Dkt.

3    No. 1-1. Defendant removed the case to this Court on August 9, 2023. Dkt. No. 1. On January

4    11, 2024, Plaintiff was granted leave to file her Amended Complaint, which asserts ten claims:

5    violation of the Free Exercise Clause, retaliation in violation of the First Amendment, violation

6    of the Americans with Disabilities Act (ADA), failure to accommodate her religious belief under

7    Title VII of the Civil Rights Act of 1964, breach of contract, tortious interference with contract,

8    deprivation of a property interest without due process in violation of the Fourteenth Amendment,

9    violation of the Equal Protection Clause of the Fourteenth Amendment, conspiracy to deprive

10   rights under 42 U.S.C. § 1985(3), and conspiracy to obstruct justice under 42 U.S.C. § 1985(2).

11   *See* Dkt. No. 24 (Amended Complaint) at 28–46.

12       On September 25, 2024, the Court granted Defendant's motion (Dkt. No. 28) to dismiss

13   Plaintiff's First Amendment, ADA, breach of contract, tortious interference with contract, Equal

14   Protection, conspiracy to obstruct justice, and conspiracy to deprive rights claims. Dkt. No. 40.

15   The Court dismissed seven of these eight claims with prejudice but dismissed Plaintiff's claim

16   for breach of contract without prejudice and gave Plaintiff until October 25, 2024, to amend that

17   claim. *Id.* at 39. Plaintiff opted not to amend, and discovery moved forward on Plaintiff's two

18   remaining claims: her claim of religious discrimination under Title VII, on a failure-to-

19   accommodate theory; and her due process claim.

20       Defendant now moves for summary judgement on the remaining claims.

21                        **II.    LEGAL STANDARD**

22       Summary judgment is appropriate where "the movant shows that there is no genuine

23   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

24   Civ. P. 56(a). At this stage, the Court does not make credibility determinations, nor does it weigh

the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Munden v. Stewart Title Guar. Co.*, 8 F.4th 1040, 1044 (9th Cir. 2021). The inquiry turns on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. A genuine triable issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir. 2009) (explaining that this is the inquiry at the summary judgment stage, "[s]tripped to its core"). Additionally, "all justifiable inferences" must be drawn in the non-movant's favor, *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)), "only in the sense that, where the facts specifically averred by [the non-moving] party contradict facts specifically averred by the movant, the [summary judgment] motion must be denied," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

Under Federal Rule of Civil Procedure 56, to establish that a fact cannot be genuinely disputed, the movant can either cite the record or show "that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Once the movant has made such a showing, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal citation omitted); *see also Anderson*, 477 U.S. at 252 (specifying that the non-movant must show more than the "mere existence of a scintilla of evidence"); *accord In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The non-movant "bears the burden of production under Rule 56 to 'designate specific facts showing that there is a genuine issue for trial.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The Court will enter summary judgment "against a party who fails to make a

1    showing sufficient to establish the existence of an element essential to that party's case, and on

2    which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322 (1986); *see also*

3    *Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 798, 805 (9th Cir. 2010) (affirming

4    grant of summary judgment against appellant who had "failed to adduce any evidence or

5    authority to support her claim"), *cert. denied,* 563 U.S. 1008 (2011).

6    **III.    DISCUSSION**

7    **A.    Defendant's Motion to Strike**

8        As a preliminary matter, in its reply in support of summary judgment, Defendant moves

9    to "strike and disregard improper and inadmissible statements in Moriarty's supporting

10    declarations and the corresponding assertions in her brief." Dkt. No. 67 at 3. The Court will

11    address Defendant's objections in turn.

12        First, Defendant objects to Plaintiff's lay opinions as to "whether/how she could limit

13    COVID-19 exposure, infection, and transmission," because Plaintiff lacks medical qualifications

14    to offer these opinions. *Id.* The Court agrees that Plaintiff does not have the expertise to offer

15    opinions on whether her precautions rendered her "safe," and notes further that Plaintiff cannot

16    know with certainty that she and her crews had "been safely using" earlier COVID-19

17    procedures (Dkt. No. 57 ¶ 22), because she would not necessarily know if either she or any of

18    her crew members contracted and/or transmitted COVID-19 without developing symptoms.

19    Although the Court does not strike Plaintiff's statements, it does not consider them as evidence

20    of whether any accommodation was safe or effective.

21        Defendant also objects to numerous statements by Plaintiff and Larry Hannaford, who

22    temporarily covered some of Plaintiff's General Foreman duties after her separation. Dkt. No. 67

23    at 3. Defendant argues, *inter alia*, that Plaintiff and Hannaford have not established personal

24    knowledge as to the duties and work schedules of other employees in MMD or a foundation for

the assumption that those roles were similar to Plaintiff's (*id.*), that Hannaford lacks personal knowledge as to Plaintiff's day-to-day responsibilities (*id.* at 4), and that their opinions on which of Plaintiffs' duties are essential or could have been performed remotely are irrelevant.

A motion for summary judgment must be based on admissible evidence. *See* Fed. R. Civ. P. 56(c)(2) (providing for objections to material that "cannot be presented in a form that would be admissible in evidence"); Fed. R. Civ. P. 56(c)(4) (requiring "personal knowledge," "facts that would be admissible in evidence," and a showing "that the affiant or declarant is competent to testify on the matters stated"); *United States v. Dibble*, 429 F.2d 598, 601–02 (9th Cir. 1970); *Rosa v. Taser Int'l, Inc.*, 684 F.3d 941, 948 (9th Cir. 2012) ("In examining whether summary judgment is appropriate, we 'consider only alleged facts that would be admissible in evidence'" (quoting *Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257, 1260 (9th Cir. 1983))). Defendant's objection is well taken. While the Court will not go statement-by-statement to strike portions of the declarations, it will not give any weight to statements by Plaintiff, Hannaford, or other declarants that it finds are inadmissible opinions or that are not based on personal knowledge. Where relevant, the Court will address such findings in its discussion.

**B.      Defendant's Motion for Summary Judgment**

Plaintiff asserts two remaining causes of action: (1) a religious discrimination claim under Title VII of the Civil Rights Act of 1964 for failure to accommodate her sincerely held religious belief; and (2) a claim that Defendant violated Plaintiff's due process rights under the Fourteenth Amendment to the United States Constitution. Defendant moves for summary judgment on both claims.

**1.      Claim One: Failure to Accommodate under Title VII**

Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of employment, because of" that individual's religion. 42 U.S.C. § 2000e-2(a)(1). Where an employment duty conflicts with an employee's religious practice, an employer must "reasonably accommodate" the religious practice unless such accommodation would impose "undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). To establish a prima facie case of failure to accommodate religious practices under Title VII, an employee must show that: (1) the plaintiff had a bona fide religious belief, the practice of which conflicted with an employment duty; (2) the plaintiff informed the employer of the beliefs and the conflict; and (3) the employer discharged, threatened, or otherwise subjected her to an adverse employment action because of her inability to fulfill the job requirement. *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004).

Once a plaintiff has alleged a prima facie case of religious discrimination, the burden shifts to the employer to show "that it initiated good faith efforts to accommodate the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Lawson v. Washington*, 296 F.3d 799, 804 (9th Cir. 2002) (quoting *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993)). "'[U]ndue hardship' is shown when a burden is substantial in the overall context of an employer's business." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023).

### a.    Prima Facie Case

While the burden to establish a prima facie case is "not onerous," a plaintiff must still produce *some* evidence to meet her burden. *Lyons v. England*, 307 F.3d 1092, 1112, 1113 (9th Cir. 2002). Here, "the Port concedes Plaintiff has established a prima facie case for religious failure to accommodate, and the burden now shifts to the Port" to produce evidence in support of its undue hardship defense. Dkt. No. 55 at 14. However, the Court notes that Plaintiff has not

provided sworn testimony or any other admissible evidence that she holds a sincere religious

belief that prevented her from becoming vaccinated against COVID-19. *See generally* Dkt.

Nos. 55, 57. Her declaration does not address her beliefs or reasons for choosing not to become

vaccinated, only recounting that "HR-34 did not allow for any exemptions except for 'limited'

religious and medical exemptions. I submitted a religious exemption[.]" Dkt. No. 57 at 7.

Nevertheless, for the purposes of this motion, and given Defendants' concession, the Court will

assume without deciding that Plaintiff could produce such evidence at trial. The remaining

elements of Plaintiff's prima facie case are clearly supported by the factual record, *see supra*

Section I.D–E, and appear to be uncontested for all purposes. *Compare* Dkt. No. 44 at 6–17, *with*

Dkt. No. 55 at 6–13. Defendant made COVID-19 vaccination an employment requirement. Dkt.

No. 48 at 12. Plaintiff submitted an exemption/accommodation request informing Defendant that

she had religious beliefs (and safety concerns) that prevented her from receiving vaccines. *Id.* at

34–40; Dkt. No. 57 ¶ 18. Ultimately, Plaintiff was terminated from her position because she did

not become vaccinated. Dkt. No. 48 at 53–55 (letter of separation). Therefore, the Court assumes

without deciding that Plaintiff can put forward evidence to support each element of a prima facie

case of religious discrimination under Title VII on a failure-to-accommodate theory.

### b.    Undue Hardship

Defendant argues that Plaintiff's failure-to-accommodate claim under Title VII fails

because, as Defendant determined at the time, accommodating Plaintiff's exemption from the

COVID-19 vaccination requirement would have imposed an undue hardship on Defendant in the

operation of its business. Dkt. No. 44 at 13–17, 19–26; *see Groff*, 600 U.S. at 470. "[U]ndue

hardship is a complete defense to [a] failure-to-accommodate claim." *White v. Univ. of Wash.*,

No. C22-1798, 2024 WL 1241063, at *6 (W.D. Wash. Mar. 22, 2024) (citing *Petersen v.

Snohomish Reg'l Fire & Rescue*, No. C22-1674, 2024 WL 278973, at *6 (W.D. Wash. Jan. 25,

2024), *aff'd*, 150 F.4th 1211 (9th Cir. 2025)). An employer establishes undue hardship if an

accommodation would result in "substantial increased costs in relation to the conduct of its

particular business." *Groff*, 600 U.S. at 470–71. However, "costs" that courts consider are not

limited to financial expenditures; they also include non-monetary impacts such as an

"accommodation's effect on co-workers" that "may have ramifications for the conduct of the

employer's business," *Groff*, 600 U.S. at 472, as well as any "cost to an employer's mission."

*Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1151 (D. Or. 2024). "[W]hen a

proposed accommodation compromises safety in the workplace, this, too, can be an undue

hardship." *Id.* at 1157 (citing *Kalsi v. N.Y.C. Transit Auth.*, 62 F. Supp. 2d 745, 758 (E.D.N.Y.

1998), *aff'd,* 189 F.3d 461 (2d Cir. 1999)); *see also Efimoff v. Port of Seattle*, No. C23-1307,

2024 WL 4765161, at *8 (W.D. Wash. Nov. 13, 2024) ("Courts consider economic and non-

economic costs, including safety and health risks."); *Bordeaux v. Lions Gate Ent., Inc.*, 703 F.

Supp. 3d 1117, 1134 (C.D. Cal. 2023) ("Non-economic impacts on coworkers can be considered,

so long as those impacts are not the result of employee animosity to a particular religion, to

religion in general, or the notion of accommodating religious practice."), *aff'd,* No. 23-4340,

2025 WL 655065 (9th Cir. Feb. 28, 2025).

      The Supreme Court has instructed district courts to "apply the test in a manner that takes

into account all relevant factors in the case at hand, including the particular accommodations at

issue and their practical impact in light of the nature, size and operating cost of an employer."

*Groff*, 600 U.S. at 470–71 (citation modified). A district court considering an undue hardship

defense is further instructed to "resolve whether a hardship would be substantial in the context of

an employer's business in the common-sense manner that it would use in applying any such

test." *Id.* at 471. Finally, "[c]ourts within the Ninth Circuit recognize that 'it is appropriate to

confine the [undue hardship] analysis to the information available to the employer when it made its undue hardship decision.'" *Efimoff*, 2024 WL 4765161, at *9 (collecting cases).

### (1)    Fully Remote Work

Plaintiff alleges that Defendant could have accommodated her religious exemption from the COVID-19 vaccine by allowing her to work fully remotely. Dkt. No. 55 at 18–28. Defendant contends that such an accommodation would have imposed an undue hardship on its operations because it would have required the Port to "experiment" with remote performance of a role that had never been performed 100% remotely, and to "either remove essential job functions" from Plaintiff's position "or have other employees perform them." Dkt. No. 67 at 7–8. Plaintiff does not dispute that hers was an in-person position, only that her in-person duties were "essential" or truly needed to be performed in person and by her. *See, e.g.*, Dkt. No. 55 at 20. But, as Defendant points out, it is an employer, not an employee, who has "the ultimate authority to determine what are the essential functions of a job position, and if it requires in-person work." Dkt. No. 67 at 8 (quoting *Kather v. Asante Health Sys.*, No. C22-1842, 2025 WL 1788267, at *8 (D. Or. June 25, 2025), *report and recommendation adopted,* 2025 WL 2374384 (Aug. 14, 2025)); *see also Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 991 (9th Cir. 2007) (in similar ADA accommodation context, "the ADA and implementing regulations direct fact finders to consider, among other things, 'the employer's judgment as to what functions of a job are essential'" (quoting 42 U.S.C. § 12111(8))).

Taking the facts in the light most favorable to Plaintiff, much of her daily work consisted of administrative computer tasks that could have been performed at home. But skilled tradespeople in MMD promoted General Crew Chief positions are typically expected to continue performing trade-specific work in their areas of expertise. *See* Dkt. No. 47 ¶ 5; Dkt. No. 54 ¶ 10.

Plaintiff's area of expertise was in the lock shop. Dkt. No. 54 ¶ 10. Lock shop work was in person and performed only by Plaintiff and one crew chief. In Plaintiff's words:

> Historically, only 2 people on the crew were fully trained to cover the Lock shop duties. In 2021, Bryan [Bertram] and I were those two people. However, Bertram or I could have easily trained an additional back-up as needed. Additionally, we had back-up key-cutting machines and pin kits that I could have taken home with me to allow me to cut keys and pin cores as needed. In these instances, Teamsters could have come to pick up the keys and/or cores to deliver them, or I could have dropped them off at the shop without interacting with anyone in person. While I would not have been able to print badges working remotely, there would have still been the option of going to Pier-69 to have a badge printed in the event Bertram was not working. I would however have still had the ability to manage badge access and deactivate them as needed.

Dkt. No. 57 ¶ 15. Some, but not all, of Plaintiff's lock shop responsibilities could have been performed remotely, but other responsibilities would have fallen to others in her absence.

But the lock shop work was not Plaintiff's only responsibility. Plaintiff was also the leader of a large division of skilled tradespeople, who, according to her own testimony, felt "abandoned" when their leaders worked remotely for a short period during the pandemic. Dkt. No. 57 ¶ 16. It is undisputed that the role of Carpenter and Pile Buck General Crew Chief / General Foreman, aside from brief periods of health or family-care need, was always performed entirely in person. *See* Dkt. No. 57 ¶13; Dkt. No. 54 ¶ 7; Dkt. No. 63 (Hannaford Decl.) ¶¶ 12–13; Dkt. No. 50 (Joyce Decl.) ¶ 6. It was performed in person by Plaintiff. Dkt. No. 57 ¶ 13. It was performed in person by Plaintiff's temporary successor, Larry Hannaford, who took on some, but not all, of her job duties, working remotely only when he contracted COVID-19. Dkt. No. 63 ¶¶ 9, 11, 13. And in-person work at least three days a week was required by the Port in hiring Plaintiff's permanent replacement. *See* Dkt. No. 54 ¶¶ 8, 10.

The declaration of Plaintiff's supervisor Dan Fitzgerald confirms Defendant's determination that allowing Plaintiff to work fully remotely would have imposed an undue

hardship. Dkt. No. 59. Fitzgerald testifies that Plaintiff was responsible for "supervising multiple crew chiefs [and] managing personnel and work assignments for the Carpenter, Pilebuck, and Lock & Security Shops." *Id.* ¶ 3. He confirms that Plaintiff's duties "primarily involved administrative, scheduling, procurement, and coordination tasks," and that these "were office-based and could be adapted to remote work with proper planning and periodic evaluation." *Id.* ¶ 8. He also testifies, however, that he "believe[s] there is significant intrinsic value in face-to-face presence for a supervisor or manager" and had learned from his own experience providing hybrid supervision during the workplace disruption that "many aspects of communication were more difficult without physical presence, especially given the hands-on and interpersonal nature of our workforce." *Id.* ¶¶ 7, 9. Fitzgerald suggested that the Port might have needed to compensate another employee for "temporarily assum[ing]" some of Plaintiff's duties "during remote work," but he did "not know how frequently, if at all, that would have occurred or how much it would have cost the Port." *Id.* at 10.[8] Because of the high competence of Plaintiff and her crew chiefs, Fitzgerald believed "working remotely could have been a potential consideration" and that, while it was "difficult to predict the full implications of remote work," "some form of temporary or trial accommodation could have been viable" *Id.* ¶¶ 7, 5.

In other words, Fitzgerald thought that accommodating Plaintiff might (but might not) have been possible, and only on a temporary basis. Although he was personally "open to discussing a trial period" of such an arrangement, he indicates only that MMD had "capacity for short-term adaptation" (*id.* ¶ 11), and that "the accommodation and cost implications of remote work for Kathleen would have needed to be evaluated and monitored" (*id.* ¶ 10). None of this indicates that a remote accommodation would have been simple, straightforward, or sustainable.

---

[8] Gauthier, the Port's Labor Relations Manager, states in his declaration that under the relevant union agreement, any represented employee working out-of-class to cover any of Plaintiff's duties would have had to have been compensated at the General Crew Chief rate of pay. Dkt. No. 47 ¶ 4.

1   In other words, Fitzgerald's declaration is consistent with Defendant's determination that

2   reconfiguring Plaintiff's position would have posed a considerable burden. That Fitzgerald was

3   personally willing to participate in a "temporary or trial accommodation" did not obligate

4   Defendant to do so, not does it create a material issue of fact as to whether such an

5   accommodation would have imposed an undue hardship. This is especially so given the

6   administrative burden of transforming and monitoring Plaintiff's position, and the fact that

7   Defendant was tasked with considering religious accommodations not only for Plaintiff, but for

8   all 114 unvaccinated staff who requested them. *See* Dkt. No. 48 ¶ 13.

9        "[A]n employer is not required to wait until it feels the effects of the proposed

10   accommodation before determining its reasonableness." *Efimoff*, 2024 WL 4765161, at *9

11   (citation modified) (quoting *Lavelle-Hayden*, 744 F. Supp. 3d at 1159). By the same token, "an

12   employer is not required [to] restructure an employee's duties or pass them off to another worker

13   if doing so would be an undue hardship. *Kather*, 2025 WL 1788267, at *8; *see also Lake v.*

14   *HealthAlliance Hosp. Broadway Campus*, 738 F. Supp. 3d 208, 220–21 (N.D.N.Y. 2024)

15   (holding that operational impacts from restructuring positions to avoid contact with others would

16   create an undue hardship). Here, Defendant considered Plaintiff's accommodation request and

17   determined that: (1) Plaintiff's position required an on-site presence and required her to have

18   close contact with coworkers, contractors, and construction managers while performing her

19   duties; and (2) allowing her to work remotely would have required removing the in-person,

20   essential functions of her job and assigning them to others. Dkt. No. 48 ¶¶ 17–19. This

21   determination was reached after decision makers at the Port conducted an individualized analysis

22   that involved reviewing a detailed description of Plaintiff's job duties and a questionnaire

23   completed by her direct supervisor about the feasibility of accommodating her with remote work

24   and what that might require. *Id.* ¶ 16. While Plaintiff alleges that Defendant should have done

1    more to understand her job, such as talking directly with her and/or Fitzgerald, (Dkt. No. 55 at

2    21), she points to no authority requiring these specific steps, and the Court is aware of none. The

3    Court finds that Defendant conducted the individual, "fact-specific inquiry" required under *Groff*

4    in determining that Plaintiff's religious exemption to COVID-19 vaccination could not be

5    accommodated with a fully remote work schedule. 600 U.S. at 143.

6        The job description that Fitzgerald supplied to decision makers was a 2017 "job analysis"

7    developed by a consulting firm, Bock Consulting, for the position Carpenter and Pile Buck Crew

8    Chief Job (MM) (the "Bock analysis"). Dkt. No. 54 at 14–23. The Bock analysis indicates that it

9    was reviewed by Plaintiff and her supervisor, Dan Fitzgerald. *Id.* at 54. In-person duties listed in

10   the analysis include, among others, visiting project sites and inspecting completed work,

11   completing annual inspections of Port properties, ensuring work is being performed in a safe

12   manner, and re-keying locks. *Id.* at 15–17. Overall, Plaintiff's position is estimated to involve

13   60% administrative work, 10–20% in-person work and supervision in the field, and 5% trade-

14   specific work. *Id.* at 15.

15       In her declaration, Plaintiff challenges the accuracy and currency of the Bock analysis

16   and notes that the word "General" is missing from her job title. Dkt. No. 57 ¶ 7. In her opposition

17   brief, through counsel, Plaintiff goes farther, repeatedly alleging that Defendant considered the

18   "incorrect Bock analysis" written "for the Crew Chief position, not the General Foreman

19   position." Dkt. No. 55 at 17, 10. But while Plaintiff challenges the accuracy of certain elements

20   of the job, neither she nor any other Port employee endorses her counsel's theory that Defendant,

21   in considering Plaintiff's accommodation request, relied on a job description of "the wrong

22   position" (*id.* at 7), and the evidence does not support this claim. Dan Fitzgerald, who offers a

23   declaration in support of Plaintiff, confirms that he "included a link to the Carpenter and Pile

24   Buck Crew Chief job analysis" in his manager questionnaire, with no suggestion that this was

1    not the description of her role. Dkt. No. 59 ¶ 4. Larry Hannaford asserts (without elaboration)

2    that the Bock analysis "is an accurate reflection of what my duties were as a Crew Chief" and

3    "does not accurately reflect the core job duties of the General Foreman position." Dkt. No. 63

4    ¶ 4. However, he does not allege that it was a job description *for* a crew chief job, or that any of

5    the crew chief positions under Plaintiff were actually called "Carpenter and Pile Buck Crew

6    Chief." Plaintiff herself alleges that her duties had "changed significantly in . . . nine years," that

7    the description was "out of date and inaccurate," and that she had "failed to realize it was

8    missing the key word 'General' in front of Crew Chief." Dkt. No. 57 ¶ 7. But she stops short of

9    testifying that she believes the analysis is for any position other than her own.

10          Even if Plaintiff's declaration had gone farther, there can be no reasonable dispute that

11    the Bock analysis described Plaintiff's position because, in deposition, she testified that it did:

12          Q:  . . . Were you involved in the preparation of this document in
                 any way?

13          A:  Not that I recall.

14          Q:  Okay. So you don't recall being the employer contact for this
                 document?

15          A:  I think they put employee contact because that was my
                 position.

16          Q:  . . . So this says job analysis reviewed by Kathleen Moriarty and
                 Dan Fitzgerald. . . . So do you recall reviewing this job
17               analysis?

18          A:  I don't recall, but we probably did.

19          Q:  Okay. And have you had a chance to review this job analysis
                 during this litigation?

20          A:  Yes, I have looked over it.

21          Q:  Okay. And is this the position that you were in in 2021?

          A:  Yes.

22          Q:  . . . So is this document accurate in terms of your job duties?

23          A:  It is accurate, but there's also information about the amount
                 that needs to be on-site which is not necessarily true given all
24               the changes that were made during COVID and the technology

1    changes.

2   Dkt. No. 68 at 7–8. It is well settled as a matter of law that Plaintiff "cannot create an issue of

3   fact by an affidavit contradicting [her] prior deposition testimony." *Van Asdale v. Int'l Game*

4   *Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (quoting *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262,

5   266 (9th Cir. 1991)).

6          Another reason Plaintiff has failed to create a dispute of material fact in arguing that her

7   job could be performed remotely is that she relies largely on her job duties *during the COVID-19*

8   *workplace disruption*. Taking disputed facts in the light most favorable to Plaintiff, her job had

9   changed significantly between the time the analysis of her position was performed and the time

10  of her termination from the Port. But Plaintiff also testifies that many of these changes were

11  specific to the emergency protocols the Port implemented in response to the extraordinary

12  circumstances of a global pandemic. In her declaration, Plaintiff indicates that "by 2021, [she]

13  spent less than 1% of [her] time supervising work and personnel or providing assistance in the

14  field" (Dkt. No. 57 ¶ 9), that she "did not inspect any projects during the pandemic" (*id.* ¶ 12),

15  and that "[b]y [her] termination, about 90% of [her] work was administrative as opposed to the

16  60% in the Bock analysis" (*id.*). However, this is all when the workplace disruption was still in

17  place. Plaintiff's activities during a "workplace disruption"—when Port operations shifted to

18  focus on essential functions and public safety—are not indicative of the typical duties of her job.

19  For example, instead of working on construction projects that required inspections, Plaintiff

20  reports that her crew "did not complete any projects to the best of my recollection, instead

21  performing routine maintenance and installing pandemic-specific fixtures like hands-free

22  dispensers (i.e. paper towel, hand sanitizer, soap, etc.) and plexiglass barriers," which did not

23  need her inspection. *Id.* Larry Hannaford's declaration also indicates that Plaintiff's crews "had

24  no projects *during the pandemic* that needed an inspection" and that attending meetings remotely

was encouraged "[d]uring the pandemic." Dkt. No. 63 ¶¶ 8, 10 (emphasis added). What Plaintiff

does not present is clear evidence about her *typical* duties—that is, the duties she performed

*before* the workplace disruption. However, Plaintiff's deposition testimony suggests these duties

were closer to the job duties described in the Bock analysis than were the emergency-protocol

duties she focuses on in her declaration and opposition. *See* Dkt. No. 68 at 8 ("It is accurate, but

there's also information about the amount that needs to be on-site which is not necessarily true

given all the changes that were made during COVID and the technology changes.")

       If Plaintiff's duties during the workplace disruption give little insight into her typical

responsibilities, they are perhaps even less instructive as to the level of hardship involved in

allowing her to work remotely. The fact that the Port was forced to accommodate more telework

than usual during the COVID-19 pandemic (particularly before an effective vaccine was

available) does not mean it was required to accommodate emergency protocols indefinitely, or

that a permanent or indefinite telework accommodation would not pose an undue hardship.[9]

Indeed, it is likely that the Port's shift in operations during the workplace disruption imposed a

very great hardship indeed. If Plaintiff and other supervisors and managers in MMD had worked

fully remotely during that time, that hardship would have been even greater than it was. This is

evidenced by Plaintiff's statement that she returned to work in person upon seeing the negative

impact of remote work on the morale of tradespeople left to work in person. *See* Dkt. No. 57

¶ 16. It is further confirmed by the declarations of Plaintiff's direct supervisor and another MMD

manager at his level that "even with the mostly supervisory/administrative nature of [their]

positions," their attempts to work remote or hybrid schedules early in the pandemic were

---

[9] Although Plaintiff suggests she could have been accommodated temporarily because "the pandemic was not expected to last forever" (Dkt. No. 55 at 19), it is undisputed that she was seeking a *permanent* exemption from the workplace requirement of COVID-19 vaccination. The possibility that a workplace requirement might change in the future, or that accommodating an exemption might eventually become less burdensome (for example, when the COVID-19 public health emergency was over), is not a part of the analysis under Title VII. Furthermore, Defendant did not and could not know when the COVID-19 pandemic would end. Dkt. No. 51 ¶ 69.

unsuccessful or challenging "given the hands-on and interpersonal nature of our workforce." Dkt. No. 49 (Johanson Decl.) ¶ 5; Dkt. No. 59 ¶ 9. Plaintiff's personal opinions that her experienced crew chiefs "needed very little direction" (Dkt. No. 57 ¶ 9), that her visits to project sites were unnecessary outings she undertook "for a change of pace" (*id.* ¶ 11), and that she could inspect work via videocall if needed (*id.*) do not create a material dispute of fact about the importance of the Carpentry and Pile Buck General Crew Chief's presence on site.

Because they also focus on telework arrangements specific to the workplace disruption, the declarations of Gail Abe (Dkt. No. 58), Magdalena Foss (Dkt. No. 60), John Hall (Dkt. No. 61), Kelly Wolf (Dkt. No. 52), and Vetle Strand (Dkt. No. 64) are not helpful. Plaintiff cites these declarations to support her assertion that some Port employees, including other supervisors and managers within MMD were allowed (or even required) to work fully or partly remotely during the workplace disruption, even while supervising on-site staff. Dkt. No. 55 at 11. To some extent, this fact is undisputed.[10] Indeed, Plaintiff testifies that she herself was allowed to work fully remotely during the workplace disruption, but that she chose to return to in-person work after two weeks. Dkt. No. 57 ¶ 16. But more importantly, it is immaterial. Putting aside the question of whether these declarants have personal knowledge of the duties and schedules of other Port employees, all their declarations describe remote work *during the COVID-19 workplace disruption*. The fact that remote work was accommodated in certain positions during an emergency protocol—which, again, is undisputed—cannot create an issue of fact about whether it was reasonable to allow Plaintiff to work remotely permanently or indefinitely. This is especially true where Plaintiff has offered no evidence beyond conclusory assertions that the duties of these other positions were similar to hers.

---

[10] Defendant does offer several declarations by Port staff challenging the specific assertions of Plaintiff's declarants as to the amount of remote work performed by individual Port staff. *See, e.g.*, Dkt. Nos. 50 (Joyce Decl.), 53 (Silcox Decl.). But because these factual disputes are all specific to the emergency protocols of the workplace disruption, the Court does not find them material.

While the record establishes that accommodating Plaintiff by allowing her to work remotely may have been possible, at least temporarily, this showing is not enough to defeat Defendant's undue-hardship defense. It is uncontested that, aside from a few temporary periods, Plaintiff performed her duties fully in person, even when other employees were required to stay home during the workplace disruption. It is uncontested that transforming Plaintiff's position to a fully remote one would have required careful planning and continual oversight. It is uncontested that at the time the Port was faced with making decisions about vaccination accommodations, it was functioning under emergency protocols and had 113 other potential accommodations to consider. It is undisputed that Plaintiff was responsible for multiple crews of skilled tradespeople, all working in person, and that a remote accommodation would have prevented Plaintiff from providing in-person supervision, mentorship, and support to her crew members or her crew chiefs. It is undisputed that Plaintiff sometimes inspected worksites in person, and that she could not have done this with a remote accommodation. It is undisputed that Plaintiff's job involved skilled work in person in the lock shop, and that other employees would have had to either take over these duties or spend time delivering materials to and from Plaintiff's home if she were not present at the shop.

These undisputed facts conclusively establish that the hardship imposed by accommodating Plaintiff with a remote accommodation was significant, well beyond what the law requires an employer to take on to accommodate a religious objection to a workplace policy. Therefore, Plaintiff has failed to establish a genuine dispute of material fact that transforming her job into a fully remote position would not have created an undue hardship for Defendant.

### (2)    Hybrid Work Schedule

Plaintiff also alleges that Defendant could have accommodated her unvaccinated status by allowing her to "work[] mostly remotely and then perform[] her on-site duties using

distancing, testing, masking and other PPE, avoiding contact with others, and coming on-site during off hours ('Hybrid accommodation')."[11] Dkt. No. 55 at 29. Here, however, Defendant has presented extensive, unrebutted evidence that allowing unvaccinated employees to work in person with others, even on a part-time basis and with mitigations such as masking and testing, could not sufficiently mitigate the health and safety risk represented by their unvaccinated status, and that such accommodation would impose an undue burden. Plaintiff has failed to point to evidence that places these facts in dispute and, accordingly, has not created an issue for a jury as to whether a hybrid accommodation would have been reasonable.

It is uncontested that fully remote work was the only accommodation Defendant provided to any of its unvaccinated employees. Dkt. No. 55 at 10. However, Plaintiff asserts that the Port did not even *consider* other accommodations. *Id.* at 12. The record before the Court does not support this claim. Defendant has presented testimony by the Port's Director of Health and Safety and Senior Director of Human Resources that the Port considered weekly or daily COVID-19 testing, masking, and hybrid teleworking, but ruled them out on the basis of available public health information.[12] Dkt. No. 46 ¶¶ 9, 12, 23–25; Dkt. No. 48 ¶¶ 13–14, 16–19. The Port determined that none of these accommodations were reasonable alternatives to vaccination because (1) public health data and guidance at the time established that unvaccinated individuals posed a greater risk of contracting COVID-19, becoming severely ill, and transmitting COVID-19 to others, and (2) all other available safety measures had limitations that made them less effective than vaccination for limiting the spread of COVID-19 in the workplace. Dkt. No. 48 ¶ 17.

---

[11] Plaintiff's response in opposition to summary judgment suggests that she sent an email to Port decision makers "outlining her other suggested accommodations," but that this email was not read. Dkt. No. 55. This email was not provided to the Court. Plaintiff has also not presented evidence that her email was not read. *See supra* n.7.

[12] Plaintiff alleges that "30(b)(6) testimony of multiple witnesses and Port emails" show that these accommodations were not actually considered, but the citations provided do not support this assertion. Dkt. No. 55 at 31 & n.10, n.11.

In the COVID-19 context, "[n]umerous courts have found the possibility of an unvaccinated individual getting others sick to be a non-speculative risk that a court may consider when performing an undue hardship analysis." *Bordeaux*, 703 F. Supp. 3d at 1136 (collecting cases). The Ninth Circuit has found undue "Health and Safety Costs" related to the risks of COVID-19 infection and transmission posed by in-person employees unvaccinated status:

> *Groff* tells us that we may look to EEOC guidance to help determine if these health and safety costs would have imposed an undue hardship . . . . The EEOC has said that when considering undue hardship in the context of COVID, employers should consider if the employee "works in a solitary or group work setting," "has close contact with other employees or members of the public," and "works outdoors or indoors." Each of these considerations weighs in favor of finding undue hardship here— firefighters work in group settings, interfacing constantly with coworkers and the public, both inside and outdoors.
>
> Allowing unvaccinated firefighters to keep working in October 2021 would have come at a substantial cost to SRFR. The objective, unrebutted medical evidence shows that SRFR would have faced significant health and safety costs by allowing unvaccinated firefighters to continue working, even with accommodations. . . . Because firefighters did not (and likely could not) always mask and social distance, SRFR needed a way to ensure employee and public safety. Dr. Lynch's opinion explains that the vaccine offered the safest, easiest, and most effective way of doing so.

*Petersen v. Snohomish Reg'l Fire & Rescue*, 150 F.4th at 1220 (internal citations omitted). Unlike the firefighters in *Petersen*, Plaintiff did not interact with the public in her work, and much of her work was administrative and computer based. However, she spent most of her time indoors in the MMD shop, where several of her crews and other members of MMD were also present, and her office was a "hub for not only her own team but also for many managers and crew members throughout the department." Dkt. No. 59 ¶ 7.

Plaintiff asserts that she could have social distanced and continued the protocols Port employees had "previously been safely using to prevent the spread of Covid." Dkt. No. 57 ¶ 22.

1   However, these protocols were not always required for vaccinated employees after July 9, 2021.

2   Dkt. No. 56 at 102 (July 9, 2021, Emergency Preparedness–Portwide email). Further, Plaintiff

3   testifies she *could* have worn a mask if accommodated (even when present alone during off

4   hours). Dkt. No. 57 ¶ 20. But Plaintiff ignores the fact that she brought this lawsuit challenging

5   *both* the masking and vaccination requirements implemented by the Port. In her verified

6   Amended Complaint, Plaintiff calls face masks "experimental medical devices" and asserts that

7   her "firmly held spiritual beliefs proscribe the coerced wearing of a face mask to restrict her

8   breathing." Dkt. No. 24 ¶ 20. She also stated, under penalty of perjury, that she had previously

9   informed Port personnel of her unwillingness to wear masks (*Id.* ¶ 45), sought an

10  accommodation exempting her from the mask policy (*id.* ¶ 174), and emailed Defendant a

11  document titled "Constructive Notice and Warning to All Washington State Employers,"

12  informing it that "I am under no legal obligation to wear a mask or be Vaccinated for the Covid-

13  19 Virus or PCR-Tested in your place of business . . . ." (*id.* ¶ 65; *id.* at 24). Asserting at this late

14  stage that she *could* have worn a mask is insufficient to overcome her own statements that she

15  was unwilling to wear a mask. (And in any case, Defendant determined that masking was not an

16  acceptable accommodation.)

17      Additionally, as in *Petersen*, the Defendant has provided evidence, in the form of an

18  extensive declaration by infectious disease specialist Dr. John Lynch, not only that vaccination

19  was the most effective way of preventing the spread of COVID-19 to, among, and by Port

20  employees, but that, based on what was known in 2021, "[n]o other public health strategy could

21  effectively meet the Port of Seattle's goals of maintaining critical services and operations . . .

22  while protecting the health, safety, and well-being of Port of Seattle employees and the public at

23  large." Dkt. No. 51 ¶ 80.

24

1    Dr. Lynch, whose expertise and opinions Plaintiff does not challenge, is a Professor of

2    Medicine at the University of Washington and Associate Medical Director of Harborview

3    Medical Center who spent 2020 through 2023 as the Medical-Technical Team Lead for UW

4    Medicine's COVID-19 Emergency Operations Centers. *Id.* ¶¶ 1–2. Dr. Lynch's unrebutted

5    testimony provides that "[i]n 2021, it was unknown exactly how the virus was transmitted and

6    what mitigations, aside from vaccination, were the most effective," (*id.* ¶ 75), but "what we did

7    know in 2021 . . . is that vaccines offer protection against transmission—both indoors and

8    outdoors—and that reducing transmission limits the development of more dangerous variants,

9    eases pressure on extremely overwhelmed health care facilities and saves lives," (*id.* ¶ 79).

10    Accordingly, Dr. Lynch opines:

11         In my expert opinion, regular COVID-19 precautions such as
           masking and other mitigation strategy but [*sic*] cannot replace
12         vaccination. There are no scientific data that I am aware of that
           describe an equivalency between being vaccinated in addition to
13         other mitigations and not being vaccinated with those same
           mitigations. . . . [M]asking is not a substitute for vaccination, and
14         there are no studies demonstrating that non-pharmaceutical
           interventions (such as masking, sick leave, and access to testing)
15         are, in themselves, sufficient to reduce the risk of infection and
           transmission in the workplace compared to vaccination with any
16         combination of those mitigations. Social distancing can serve as a
           layer of mitigation, but this is complicated by the fact that we do
17         not know what a "safe" distance is and by the fact that aerosolized
           virus remains floating in the air, creating a risk for people who
18         enter a room after the infected person leaves, and for people in
           adjacent spaces with shared air. Vaccination addresses all these
19         concerns.

20    *Id.* ¶ 102.

21    Dr. Lynch offers opinions on each of Plaintiff's proposed accommodations and explains

22    why, based on information available in 2021, these measures were inadequate to reduce

23    Plaintiff's risk of becoming infected and passing infection on to coworkers and members of the

24    public. *See id.* ¶¶ 51–58 (testing); ¶¶ 59–61 (masks and other barriers), ¶¶ 76–78 (social

distancing and outdoor work). In 2021, Dr. Lynch reports, workplace outbreaks "were . . . common," and employers who had implemented "opt-out testing policies for unvaccinated staff" were seeing them fail. *Id.* ¶ 51. It was not known at the time how long the pandemic would continue or if having unvaccinated employees "present for even some of their work schedule was going to carry an even greater risk as new variants emerged." *Id.* ¶ 100. None of this is contested by Plaintiff, who offers no admissible evidence to undermine the medical and scientific evidence presented by Defendant that performance of her in-person job duties would have resulted in increased health and safety risks. Nor is Plaintiff qualified to render an opinion about the health and safety risks she posed to her coworkers and other visitors to the Port due to her unvaccinated status, or the effectiveness of any particular accommodation or mitigation strategy. Although Plaintiff's declaration states that "[e]xposure was not really an issue" for her due to her personal habits and cautiousness (Dkt. No. 57 ¶ 20), and that Port employees could "safely" and effectively rely on pre-vaccination strategies to combat the spread of COVID-19 (*id.* ¶ 22), "these general assertions are unsupported by any medical evidence and would be impossible to prove at trial," *Petersen*, 150 F.4th at 1220.

The limitations of masking, testing, and social distancing exist regardless of whether an unvaccinated employee is present full time or part time: as Dr. Lynch testifies, "[t]here is no way to calculate a 'safe' cumulative time in the workplace that equates to another employee who is vaccinated doing the same work in that space." *Id.* The main mode of COVID-19 transmission—through aerosols that are produced when an infected person exhales, talks, sneezes, or coughs—means that an "unvaccinated person can . . . increase the likelihood of COVID-19 transmission and infection amongst others by simply being present, even if masked, in a lunchroom, office space, bathroom, or corridor. These aerosols can persist in the air even after the person leaves the space, like smoke from a cigarette." *Id.* ¶¶ 15, 59, 77. These facts—which, again, are

1  unrebutted—defeat Plaintiff's unsupported suggestion that she could have "fulfilled the purpose

2  of HR-34 by inspecting projects off hours when no other employees or the public were present."

3  Dkt. No. 55 at 30. Moreover, as Defendant points out, even if an off-hours accommodation could

4  have been implemented safely, it would have still left Plaintiff unable to perform the in-person

5  supervision and management aspects of her job. *See* Dkt. No. 67 at 12 n.13. In other words, it

6  would still impose an undue burden on Defendant for the reasons explained above. *See supra*

7  Section III.B.1.b.(1).

8        The one other court in this District to have considered the Port of Seattle's exemption-

9  and-accommodation process at the summary judgement stage concluded, on a similar record:

10              Dr. Lynch's undisputed expert testimony establishes the Port was
               correct in its assessment of the greater risk Ms. Efimoff had of
11              acquiring and transmitting COVID-19, the risks attendant to Ms.
               Efimoff's job duties and work environment, and the best safety
12              measure to reduce transmission of COVID-19 from her to others.
               . . . At the time of the Port's accommodation decision, King
13              County had just experienced the COVID-19 spike associated with
               the Delta wave, in which cases, hospitalizations, and deaths
14              reached some of the highest points in the pandemic. Based on this
               information, the Port reasonably concluded that allowing
15              unvaccinated employees to have direct, in-person contact with the
               public and employees posed a substantial increased cost on its
16              operations. The Port properly made its accommodation decision
               after evaluating public health data and guidance related to
17              transmission and infection rates associated with unvaccinated
               individuals and assessing those risks in the context of Ms.
18              Efimoff's job duties and work environment.

19  *Efimoff*, 2024 WL 4765161, at *13. The same is true here. Although Plaintiff says she could have

20  worked in person with non-vaccine mitigations, she offers no evidence that this was safe and

21  does not refute Dr. Lynch's testimony that it was not. Additionally, Plaintiff has not explained

22  why her case is distinguishable from Ms. Efimoff's, or the many other cases in this District and

23  beyond where courts have found that Defendants' health and safety concerns, substantiated with

24  uncontested facts about the dangers of COVID-19, the way it is transmitted, and the

insufficiency of non-vaccine mitigation measures, are sufficient to establish undue hardship on summary judgment.

Plaintiff's other arguments for a hybrid accommodation are unavailing. First, she argues that she "could have been accommodated like contractors under EX-29," a January 2022 Port policy titled "COVID-19 Contractor–Consultant Vaccination Requirement." Dkt. No. 55 at 29–30; *see* Dkt. No. 56 at 48–52 (EX-29 as of January 24, 2022). But this argument fails to create a dispute of material fact as to the undue hardship of allowing her to work in person for several reasons. First, EX-29 was issued in January 2022 and implemented in March 2022, several months after Defendant's decision that it could not accommodate Plaintiff. Dkt. No. 56 at 50 § II.B.1. Plaintiff has not presented any argument or authority that an employer's later policy can create a material issue of fact regarding its undue hardship determination from months before, especially in the dynamic and unpredictable climate of a pandemic emergency.[13]

Second, Plaintiff's argument that the Defendant's policy EX-29 evidences "non-religious exemption[s]" to its vaccine policy relies on a fundamental misunderstanding of EX-29. "Contractors," as defined in the policy, are not other individuals performing work at the Port, but other businesses with whom Defendant contracts. *See* Dkt. No. 56 at 48 § II.A.1. Workers employed by contractors were not subject to HR-34 because they were not Port employees. Out of concern that "unvaccinated workers of Contractors could potentially expose the Port employees to COVID-19," Defendant issued EX-29, requiring contractors to verify that all "Contractor Employees" were fully vaccinated against COVID-19 before "performing any work or services in person in Port Offices." *Id.* at 48 § I, 50 § II.B.1. Vaccination was not required for

---

[13] Plaintiff's testimony that she applied for her old position in May 2022, but was not considered because she remained unvaccinated, is irrelevant, because she has not asserted, and cannot now raise, a failure-to-hire claim under Title VII. Dkt. No. 57 ¶ 22; *see* Dkt. No. 55 at 17; Dkt. No. 1-1. "A plaintiff may not add new claims or theories of liability in an opposition brief to a motion for summary judgment." *Powell v. County of Orange*, No. C21-801, 2022 WL 3574282, at *3 (C.D. Cal. July 7, 2022); *see also Narambatla v. U.S. Dep't of Homeland Sec.*, 770 F. Supp. 3d 1264, 1270 (W.D. Wash. 2025).

contractor employees who had only "a fleeting physical presence with others," for example, "delivering supplies, refuse pickup, snow-removal, or a driver for a contracted shipping and delivery service briefly entering a site to pick up parcels for shipping." *Id.* at 50 § II.B.1.a. In effect, this rule meant that if a contractor employee was present at the Port in the same places a member of the public was permitted to be—that is, outdoors, in areas that were open to the public, or "fleetingly" to make a delivery or remove trash or snow—they were held to the same standards as members of the public, who were not required to be vaccinated in Port facilities that were open to the public. *See* Dkt. No. 56 at 127 (December 16, 2025, Cummins email) (confirming vaccination not required for "general public to enter public spaces on Port property"). However, where employment by a contractor granted a worker access to restricted areas defined as Port Offices, including the MMD office, vaccination was required. *See* Dkt. No. 56 at 49 § II.A.3.jj. On these facts, at least one other court in this District has found that "the standard in EX-29 was higher than in HR-34," not lower, because "EX-29 provided no accommodation process" for contractors to request religious or medical exemptions on behalf of their employees. *See* Order on Motion to Dismiss at 14, *Zimmerman v. Port of Seattle*, No. C25-624 (W.D. Wash. June 26, 2025), Dkt. No. 12. In any case, "[i]nformation about the vaccination status of persons who are not employed by the Port says nothing about the undisputed evidence of the risks attendant to [Plaintiff's] performance of her job duties while unvaccinated." *Efimoff*, 2024 WL 4765161, at *13; *see also O'Hailpin v. Hawaiian Airlines, Inc.*, 583 F. Supp. 3d 1294, 1309 n.9 (D. Haw. 2022) ("That its customer base and others outside of its employ" interact with a defendant's employees "does not undermine mitigation efforts *within its workforce* or its stated goal of protecting health and safety. Moreover, the pertinent issue is whether Plaintiffs' requested accommodations cause undue burden, not employees' exposure to unvaccinated and untested non-employees.")

Finally, Plaintiff's argument that the "Port believed the vaccine prevented the spread of COVID-19" and, therefore, Plaintiff's presence "would not affect the health and safety of the Port's employees because 100% of employees working on-site after HR-34 was implemented were vaccinated" (Dkt. No. 55 at 33), is easily dismissed. First, as is clear from the record, COVID-19 vaccination was never believed to be 100% effective, either by public health officials or Port officials. *See* Dkt. No. 51 ¶ 84; Dkt. No. 52 ¶ 11. Even the exhibit cited by Plaintiff to support this proposition shows that Port officials believed that vaccination prevented some, but not all, transmission and serious illness:

> The risk of disease has significantly decreased for those who are vaccinated because vaccines are effective. The higher risk is for people who are unvaccinated or who are not fully vaccinated. This is why vaccinated people can now remove masks and stop social distancing and unvaccinated people or partially vaccinated people must continue to mask and distance themselves. We will one day reach a place where there are enough vaccinated individuals to provide herd protection to those who are unvaccinated but we are not there yet.

Dkt. No. 56 at 105 (Gerard email).

> The science shows us that the vaccine prevents the spread of COVID and significantly lowers your chance of a being hospitalized or dying from COVID. . . . Locally, King County public health data shows that not fully vaccinated people are 50 times more likely to be hospitalized for COVID and 30 times more likely to die of a COVID related illness. People not fully vaccinated are seven times more likely to test positive for COVID.

*Id.* at 110 (Metruck email).

Additionally, the premise that Plaintiff would have been a single unvaccinated individual among an otherwise fully vaccinated staff belies the reality that 113 other Port employees also requested COVID-19 vaccine exemptions. As Ninth Circuit held in *Petersen*, the number of requests that "were initially received is the critical data point because after receiving those requests, [an employer] ha[s] to make a decision regarding accommodation." 150 F.4th at 1220

(citation modified). Plaintiff offers neither evidence nor argument that the Port could have safely accommodated over 100 employees with her requested accommodation, and she does not rebut Defendant's evidence of the grave safety risk it would have assumed in doing so.[14]

"In summary, Dr. Lynch's undisputed expert testimony establishes the Port was correct in its assessment" of Plaintiff's greater risk of acquiring and transmitting COVID-19 due to her unvaccinated status, the risks attendant to in-person work in Port offices, and the best safety measure to reduce transmission of COVID-19 from Plaintiff to others. *Efimoff*, 2024 WL 4765161, at *13; *see also* Dkt. 15 ¶¶ 101–102; *Petersen*, 150 F.4th at 1218–20 (Dr. Lynch's undisputed opinions "established why [p]laintiff's proposed accommodation—testing, masking, and social distancing in lieu of vaccination—was inadequate"); *Slater v. Behavioral Health Res.*, No. C23-5270, 2024 WL 4290289, at *2, 4–5 (W.D. Wash. Sept. 25, 2024) (employer explained why accommodating the unvaccinated plaintiff would have imposed substantial health and safety risks to its patients and staff, and Dr. Lynch's expert opinion affirmed employer's conclusion). The Port properly made its accommodation decision, and Plaintiff has not produced evidence establishing a genuine dispute of material fact that allowing her to work in person without vaccination for any portion of her time would have imposed substantial health and safety costs and, therefore, amounted to an undue hardship.

*        *        *

As Plaintiff has failed to point to facts creating a genuine dispute that accommodating her vaccine exemption would have imposed an undue hardship, Defendant is entitled to summary judgment on this claim.

---

[14] This portion of the *Petersen* decision also confirms the correctness of Defendant's decision to first consider on a staff-wide level which accommodation(s) would pose an acceptable cost, then individually analyze the duties of each position to see if an employee in that role could be accommodated.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

### 2.    Claim Two: Due Process Under the Fourteenth Amendment

A procedural due process claim requires: (1) a constitutionally protected liberty or property interest; (2) a deprivation of that interest by the government; and (3) a lack of process. *Shanks v. Dressel*, 540 F.3d 1082, 1090 (9th Cir. 2008) (citing *Portman v. County of Santa Clara,* 995 F.2d 898, 904 (9th Cir.1993)). In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546 (1985), the Supreme Court held that "[t]he essential requirements of due process . . . are notice and an opportunity to respond."  In the context of government employment, due process is required before termination and consists of "oral or written notice of the charges against" the employee and "an opportunity to present [their] side of the story" before they are terminated. *Id.* Notice and opportunity can be provided without a formal hearing. *Id.* at 545.

The Ninth Circuit has repeatedly held that when a policy is generally applicable, "no procedural due process is required beyond the proper promulgation of the new substantive rule." *Bacon v. Woodward*, No. 22-35611, 2024 WL 3041850, at *2 (9th Cir. June 18, 2024) (unpublished) (citing *Rea v. Matteucci*, 121 F.3d 483, 484–85 (9th Cir. 1997)). Numerous courts in this District have reached the same conclusion when considering vaccine mandates for public employees. *See, e.g.*, *Pilz v. Inslee*, No. C21-5735, 2022 WL 1719172, at *7 (W.D. Wash. May 27, 2022), *aff'd,* No. 23-5271, 2023 WL 8866565 (9th Cir. Dec. 22, 2023); *Gray v. Wash. State Dep't of Transp.*, No. C23-5418, 2023 WL 6622232, at *5 (W.D. Wash. Oct. 11, 2023), *aff'd sub nom. Gray v. Wash. Dep't of Transp.*, No. 23-3278, 2024 WL 5001484 (9th Cir. Dec. 6, 2024), *cert. denied* 145 S. Ct. 2780 (2025); *Martinez v. Eastside Fire & Rescue*, No. C24-1706, 2025 WL 1654649, at *12 (W.D. Wash. June 10, 2025); *Shirley v. Wash. State Dep't of Fish & Wildlife*, No. C23-5077, 2025 WL 1360872, at *5 (W.D. Wash. May 9, 2025), *reconsideration denied,* 2025 WL 2165946 (May 23, 2025); *Brock v. City of Bellingham*, No. C24-850, 2025 WL 254725, at *12–13 (W.D. Wash. Jan. 21, 2025); *Strandquist v. Wash. State Dep't of Soc. &*

1   *Health Servs.,* No. C23-5071, 2024 WL 4645146, at *8 (W.D. Wash. Oct. 31, 2024),

2   *reconsideration denied,* 2024 WL 4979859 (Dec. 4, 2024). Plaintiff ignores this substantial body

3   of persuasive authority and does not attempt to distinguish HR-34 from the other vaccine

4   mandates that were found to give sufficient process simply by virtue of their proper

5   promulgation. In support of her procedural due process claim, she cites only to *Loudermill* and to

6   *Vale v. City of Seattle*, C23-1089, 2024 WL 3043592, at *6 (W.D. Wash. June 18, 2024).

7   However, the court in *Vale*, ruling on a motion to dismiss, appears to have considered only the

8   sufficiency of those plaintiffs' allegations that their *Loudermill* hearings were insufficient, not

9   whether those hearings were required in the first place. Additionally, the *Vale* court did not have

10  the benefit of the Ninth Circuit's guidance in *Bacon* on that precise question, as the *Vale* and

11  *Bacon* decisions were issued the same day. *See Bacon*, 2024 WL 3041850, at *2 (rejecting

12  arguments based on "an overly stringent, 'sham' approach to accommodations" because "no

13  procedural due process is required beyond the proper promulgation" of a generally applicable

14  vaccine mandate.)

15          Here, the Court has already ruled that HR-34 was "generally applicable." Dkt. No. 40

16  (Order on Motion to Dismiss) at 11.[15] Plaintiff has not alleged that the policy was not "properly

17  promulgated." *See generally* Dkt. Nos. 24, 55. Accordingly, this Court once again "joins other

18  district courts around the country that have rejected procedural due process challenges to

19  employer-issued vaccine mandates during the COVID-19 pandemic, finding employees are not

20  entitled to greater service than what is provided by enactment of the mandates themselves."

21  *Martinez*, 2025 WL 1654649, at *12 (quoting *Brock*, 2025 WL 254725, at *13).

22  //

23

24  _____
    [15] The only other court to have considered the general applicability of HR-34 reached the same conclusion. *See
    Novelozo v. Port of Seattle*, No. C25-111, 2025 WL 2390433, at *4 (W.D. Wash. Aug. 18, 2025).

To the extent that notice and hearing under *Loudermill* might have been required in the application of HR-34 to Plaintiff's individual case, Plaintiff has not presented evidence that her rights were violated. *See Bacon*, 2024 WL 3041850, at *2. It is undisputed that Plaintiff was given notice of HR-34, that she participated in a *Loudermill* hearing, and that she also was given an opportunity to present her case in writing. *See supra* Section I.E. That Plaintiff "did not like the substance of" Defendant's "construction of" HR-34, her work duties, and its ability to accommodate her, "is not a procedural due process objection." *Bacon*, 2024 WL 3041850, at *2.

Because Plaintiff was given all the process that was due, the Court grants summary judgment for Defendant on her due drocess claim.

## IV.    CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment (Dkt. No. 44) is GRANTED.

Dated this 26th day of November, 2025.

_____
Tana Lin
United States District Judge